# In the United States Court of Federal Claims

|  |  |
|---|---|
| COASTAL ENVIRONMENTAL GROUP, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*. | No. 22-868C <br> (Filed: January 19, 2023)* <br> (Re-issued: February 7, 2023) |

*Aron Caraway Beezley*, Washington, DC, for Plaintiff.

*Patrick Angulo*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

**OPINION AND ORDER**

**LERNER,** *Judge*.

      In this post-award bid protest, Coastal Environmental Group, Inc. ("Coastal") alleges that the U.S. Army Corps of Engineers' (the "Agency" or the "Corps") evaluation of Coastal's contract proposal was arbitrary, capricious, contrary to law, and prejudicial. Compl. ¶ 1, ECF No. 1. Coastal argues that the Agency committed prejudicial error because the solicitation contained a latent ambiguity, Coastal's proposal was subjected to disparate treatment in the evaluation process, and the Agency violated the "close at hand" doctrine. It seeks declaratory, injunctive, and other relief.

      Before the Court are the parties' cross-motions for judgment on the administrative record. In addition, the Government moves to dismiss the Complaint under Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1) for lack of subject matter jurisdiction, arguing that Coastal lacks standing to pursue this bid protest. For the reasons set forth below, Coastal lacks standing because it has not alleged facts demonstrating that it was prejudiced by purported errors in the procurement process. In the alternative, the Court finds that Coastal's protest lacks merit. Accordingly, the Government's Motion to Dismiss is **GRANTED**, and alternatively, the

---

* The Court initially filed this opinion under seal to allow the parties to propose redactions. The Court has incorporated the proposed redactions in this public version of the opinion. Words or phrases that are redacted have been replaced with [ * * * ].

Government's Motion for Judgment on the Administrative Record is **GRANTED** and Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**. The case is **DISMISSED**.

## I.     Factual Background[1]

### A.     The Solicitation

In January 2021, the Corps issued a Request for Proposals ("RFP" or "the Solicitation") for an indefinite delivery/indefinite quantity ("IDIQ") multiple award task order contract ("MATOC" or "Contract") related to environmental remediation services. Compl. ¶ 9; Pl.'s Ex. 1 at 2 (Solicitation), ECF No. 1-2; Corrected Admin. R. ("AR") 200, ECF No. 21. The Agency anticipated awarding approximately ten contracts but reserved the right to make more or fewer awards. Compl. ¶ 12; Pl.'s Ex. 1 at 2; AR 200. The RFP provided that the Source Selection Evaluation Board ("SSEB") would evaluate offerors' proposals based on three factors, in descending order of importance: Factor 1, company experience; Factor 2, performance confidence; and Factor 3, cost. Compl. ¶ 13; Pl.'s Ex. 1 at 74; AR 272 (RFP). It added that "[a]ll evaluation factors, other than cost, when combined, are significantly more important than cost." Pl.'s Ex. 1 at 74; AR 272.

For Factor 1, the most important factor, Section L of the RFP instructed offerors to "[p]rovide up to seven (7) example projects which demonstrate the Offeror's . . . and its team subcontractor's experience performing work relevant to the evaluation criteria." Pl.'s Ex. 1 at 66; AR 264 (RFP); *see also* AR 272 (listing factors in descending order of importance). Section L asked offerors to submit example projects demonstrating relevant company experience in each of the following six areas:

> a) Excavation of contaminated soil that includes stability measures such as sheeting or shoring . . .
> b) Construction of Groundwater Treatment Plants and extraction well systems requiring long term operation
> c) Relevant work performed in New York or New Jersey
> d) A Remedial Action contract value of more than $10M
> . . .
> e) [C]ost reimbursable Federal Government contracts
> f) [P]erforming relevant work as the prime contractor

Pl.'s Ex. 1 at 75; AR 273 (RFP). The Agency rated each example project as a significant strength, strength, weakness, or deficiency depending on how relevant the project was to the prompt. Pl.'s Ex. 1 at 75; AR 273 (RFP). The RFP limited offerors to "project experience that has occurred within the last ten (10) years from the proposal due date." Pl.'s Ex. 1 at 66; AR 264

---

[1] This section does not set forth factual findings. Rather, it describes the case taking the facts alleged in the Complaint as true, with all reasonable inferences construed in Plaintiff's favor on a motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

(RFP). The Agency evaluated these projects and assigned each proposal one of five ratings for Factor 1 overall:

| Rating | Description |
| --- | --- |
| **Outstanding** | Proposal indicates an exceptional understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| **Good** | Proposal indicates a thorough understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| **Acceptable** | Proposal meets requirements and indicates an adequate understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| **Marginal** | Proposal has not demonstrated an adequate understanding of the requirements, and/or risk of unsuccessful performance is high. |
| **Unacceptable** | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

Pl.'s Ex. 1 at 75–76; AR 273–74 (RFP).

Section M of the RFP also explained how the Agency evaluated Factor 2, performance confidence:

> The Past Performance Questionnaires (PPQs) and Contractor Performance Assessment Reports System (CPARS) are the primary source of information on past performance; however, the Government reserves the right to consider past performance information from other sources. The Performance Confidence evaluation considers each offeror's demonstrated recent and relevant record of performance. Absent any recent and relevant past performance history, the offeror's proposal will not be evaluated either favorably or unfavorably on performance confidence.
>
> The past performance evaluation will consider each offeror's demonstrated recent and relevant record of performance on the seven (7) examples of similar projects submitted as part of Factor 1 – Company Experience, and any additional past performance information obtained by the Government from other sources. The Government will evaluate the Past Performance Questionnaires (PPQs) submitted with the proposal for the Factor 1 projects, along with any PPQs received directly from the offeror's clients for the Factor 1 projects. . . .
>
> In addition to the PPQs, the Government will review past performance information retrieved through CPARS, using all DUNS [Data Universal Numbering System] numbers of team members (partnership, joint venture, teaming arrangement, or parent company/subsidiary/affiliate) identified in the offeror's proposal whose experience is being relied on for Factor 1. The Government will consider only the first 20 most recent and relevant CPARS evaluations. One performance confidence assessment rating is assigned for each offeror after evaluating the offeror's recent past performance.

3

> In reviewing each past performance effort by the offeror, the Government will first evaluate the recency of the offeror's past performance. Recency, as it pertains to past performance information, is a measure of the time that has elapsed since the past performance reference occurred. All CPARS are considered recent. All PPQs covering work that was performed within the past 10 years are considered recent.
>
> The second is to determine how relevant a recent effort accomplished by the offeror is to the effort to be acquired through the source selection. The relevancy determination will be based on the Factor 1 Evaluation Criteria above, e.g. Similar Scope, Similar Location, and Contract Value.

Pl.'s Ex. 1 at 76; AR 274.

For each piece of past performance information under Factor 2, the Agency designated an adjectival rating describing its relevancy: very relevant, relevant, somewhat relevant, or not relevant. Pl.'s Ex. 1 at 76–77; AR 274–75. Using the results from its recency and relevancy analyses, the Agency assigned each offeror one of five confidence ratings for the overall quality of its Factor 2 past performance:

| Confidence Rating | Description |
| --- | --- |
| **Substantial Confidence** | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| **Satisfactory Confidence** | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| **Neutral Confidence** | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |
| **Limited Confidence** | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| **No Confidence** | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

Pl.'s Ex. 1 at 77; AR at 275 (RFP).

A PPQ is a reference evaluation of contractor performance obtained from past customers. CPARS is an official database of detailed past performance records for projects performed within the last six years. *See* FAR 42.1501. When asked during the proposal drafting stage whether offerors should submit "CPARS in lieu of PPQs," the Agency responded "[n]o. The Contractor should not provide CPARS in lieu of PPQs . . . the Government will use CAGE [Commercial and Government Entity] Codes and DUNS numbers to pull CPARS for evaluation.

4

The Contractor providing CPARS as well could result in a duplication of CPARS evaluated." Compl. ¶ 20; Pl.'s Ex. 2 at 1, ECF No. 1-3 (Bidder Questions and Answers ("Q&A")); AR 386–87. In response to another similar inquiry, the Agency clarified that CPARS should not be given instead of PPQs. *See* Compl. ¶ 20; Pl.'s Ex. 2 at 9; AR 392 ("If we already have CPARS for a specific project, can we submit the CPARS instead of a PPQ? . . . Government Response[:] No.").

For Factor 3, the Agency evaluated the offeror's cost proposal for its realism and consistency with the requirements of the sample project. Pl.'s Ex. 1 at 77; AR 275. The Government adjusted the proposed cost to reflect any additions or reductions in cost, if appropriate, to determine the probable cost of the performance. *Id.* This probable cost was then used in the overall value determination for the offeror's proposal. *Id.*

### B. Evaluations and Award Decisions

Seventeen total offerors, including Coastal, submitted proposals for the RFP. *E.g.*, Pl.'s Ex. 10 at 28, 172, ECF No. 1-11 (Revised Source Selection Document); AR 6295, 6439; Pl.'s Mot. for J. on AR ("Pl.'s MJAR") at 7, ECF No. 22. In response to the Factor 1 evaluation criteria, Coastal's proposal included seven projects and four PPQs, among other criteria. Compl. ¶ 22; AR 6145. Its proposal noted: "CPAR's [sic] not included as per the [Q&A] question responses. Coastal does have the CPAR's [sic] for the projects if USACE requires them." Pl.'s Ex. 5 at PDF p. 19, ECF No. 1-6; AR 927.[2]

The SSEB evaluated all seventeen proposals based on the above criteria, and using the results of the factor evaluations, the SSEB determined which offerors presented the "best value" to the Government. Pl.'s Ex. 1 at 74; AR 272 (RFP). The Source Selection Authority ("SSA") then reviewed and affirmed the SSEB's findings. *Id.* In so doing, it explained that "it is in the Government's best interest not to conduct Discussions with any of the 17 offerors. Further, . . . it is not in the Government's best interest to establish a Competitive Range and eliminate any offeror from further consideration. . . . [T]he Comparative Analysis should be performed using the original proposals and the findings of the SSEB." Pl.'s Ex. 10 at 27; AR 6294 (Revised Source Selection Decision Document).

On April 15, 2022, the Agency awarded twelve contracts. Pl.'s Ex. 6 at 1–2, ECF No. 1-7; AR 6462–64. Coastal and four other offerors were not given awards. Pl.'s Ex. 6 at 1; AR 6462–64 (decision letter to Coastal). Each offeror's adjectival ratings, evaluated costs, and ranking are listed in the table below:

---

[2] The Agency initially declined to evaluate Coastal's proposal because of an issue with the submission system. However, after a series of protests by Coastal at the Government Accountability Office and the Court of Federal Claims, the Agency took corrective action and evaluated its proposal. Compl. ¶ 23.

| Ranked Order # | Offeror | Factor 1 Company Experience | Factor 2 Performance Confidence | Factor 3 Cost/Price (Evaluated Cost) |
|---|---|---|---|---|
| 1 | SES | Outstanding | Substantial Confidence | $[ * * * ] |
| 2 | HGL | Outstanding | Substantial Confidence | $[ * * * ] |
| 3 | BWS | Outstanding | Substantial Confidence | $[ * * * ] |
| 4 | CAPE | Outstanding | Satisfactory Confidence | $[ * * * ] |
| 5 | ERG | Outstanding | Satisfactory Confidence | $[ * * * ] |
| 6 | CONTI | Good | Substantial Confidence | $[ * * * ] |
| 7 | CAB | Good | Satisfactory Confidence | $[ * * * ] |
| 8 | EA | Good | Substantial Confidence | $[ * * * ] |
| 9 | CTI | Good | Substantial Confidence | $[ * * * ] |
| 10 | ECC | Good | Satisfactory Confidence | $[ * * * ] |
| 11 | KA | Good | Substantial Confidence | $[ * * * ] |
| 12 | LRS | Good | Satisfactory Confidence | $[ * * * ] |
| 13 | [ * * * ] | Acceptable | Substantial Confidence | $[ * * * ] |
| 14 | [ * * * ] | Acceptable | Satisfactory Confidence | $[ * * * ] |
| 15 | [ * * * ] | Acceptable | Substantial Confidence | $[ * * * ] |
| 16 | [ * * * ] | Acceptable | Satisfactory Confidence | $[ * * * ] |
| 17 | COASTAL | Acceptable | Satisfactory Confidence | $[ * * * ] |

Pl.'s Ex. 10 at 172–73; AR 6439–40 (Revised Source Selection Document).

Coastal requested a post-award debriefing from the Agency. *See* Compl. ¶ 23; AR at 6466 (Coastal request for debrief). In its debriefing letter, the Agency notified Coastal that for its Factor 1 evaluation, the seven projects submitted were designated as strengths or significant strengths for only four of the six evaluation criteria. Pl.'s Ex. 7 at 2–3; AR 6467–68 (Coastal

debriefing letter). Coastal did not submit any projects demonstrating relevant experience for criteria [ * * * ], or [ * * * ]. Pl.'s Ex. 7 at 2–3; AR 6467–68. This resulted in two weaknesses and an "Acceptable" rating for Factor 1. Pl.'s Ex. 7 at 2–4; AR 6467–69. The Agency noted that all twelve awardees "demonstrated significantly greater experience [than Coastal] under the stated evaluation criteria under Factor 1, the most important factor." Pl.'s Ex. 7 at 6; AR 6471. Moreover, while Coastal received two weaknesses, "none of the awardees had any weaknesses under Factor 1." Pl.'s Ex. 7 at 6; AR 6471.

For Factor 2, the Agency explained that "[a]lthough the performance ratings for the relevant projects were all exceptional, the number of relevant projects was limited," as [ * * * ]. Pl.'s Ex. 7 at 4; AR 6469. Therefore, given that the number of relevant projects "did not raise the government's confidence of successful performance beyond a reasonable expectation," Coastal was given a confidence rating of "Satisfactory Confidence" for Factor 2. *Id.* The Agency clarified that [ * * * ] for Coastal's Factor 2 evaluation. Pl.'s Ex. 8 at 2, ECF No. 1-9; AR 6475. It noted that "Coastal's proposal is on par with some of the awardees for Factor 2 [(i.e., some of the other awardees also received a confidence rating of satisfactory confidence)], but most of the awardees also demonstrated greater performance confidence than Coastal in Factor 2." Pl.'s Ex. 7 at 6; AR 6471.

For Factor 3, Coastal's evaluated cost was the [ * * * ] seventeen proposals. Pl.'s Ex. 10 at 28, 172; AR 6295, 6439. The Agency concluded that, based on these three factor evaluations, Coastal ranked last of all seventeen offerors and did not represent the best value to the Government. Pl.'s Ex. 10 at 28, 172; AR 6295, 6439; Pl.'s Ex. 8 at 4; AR 6477.

## C.     Procedural History

On May 4, 2022, Coastal filed a post-award bid protest with the Government Accountability Office ("GAO"). It alleged that the Agency's evaluation of its proposal "was inconsistent with the terms of the RFP and Coastal's Proposal, and it was otherwise prejudicially unreasonable." AR 6506 (Coastal GAO protest); Compl. ¶ 25. At the GAO, Coastal challenged its Factor 1 and 2 evaluations. For Factor 1, Coastal alleged that the Agency unreasonably assigned two weaknesses to its submitted projects. AR 6522. For Factor 2, Coastal alleged that the Agency failed to review relevant CPARS for its submitted projects as required by the RFP. AR 6519. On July 27, 2022, the GAO denied Coastal's protest, finding that the "agency's evaluation of the protestor's proposal . . . was reasonable and consistent with the terms of the solicitation." AR 7587. Neither the Government nor the GAO addressed standing or prejudice. *Id.* at 7591–97.

On August 8, 2022, Coastal filed its Complaint in this Court alleging that the Agency's evaluation of its Factor 2 technical proposal was arbitrary and prejudicial based on a latent ambiguity in the RFP. Compl. ¶¶ 1–2. Specifically, it pointed to the time window for which the Agency was required to retrieve past performance data in its Factor 2 evaluation and disparate treatment experienced during the Factor 2 evaluation process. *Id.* Coastal also argues in its Motion for Judgment on the Administrative Record that the Agency's violation of the "close at hand" doctrine also affected its Factor 2 evaluation. Pl.'s MJAR at 26. Unlike Coastal's GAO protest, Coastal does not challenge its Factor 1 evaluation in this case.

Coastal seeks the following relief: (1) "A declaration from the Court that the Agency's evaluation of Coastal's Proposal was prejudicially arbitrary and otherwise not in accordance with the law"; (2) "A permanent injunction requiring the Agency to clarify the RFP requirements, permit Coastal to submit a new proposal based on such clarified requirements, and evaluate Coastal's new proposal in accordance with the clarified RFP"; (3) "An order directing the Agency to clarify the RFP requirements, accept a new proposal from Coastal based on those clarified requirements, reasonably evaluate Coastal's new proposal in accordance with the clarified terms of the RFP, and make an award to Coastal should the evaluation demonstrate that award is appropriate"; and (4) attorneys' fees. Compl. at 32–33.

## II. Discussion

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Government moves to dismiss for lack of standing because Coastal has not sufficiently alleged that the errors in the procurement process, if true, were prejudicial. Def.'s Mot. to Dismiss and Cross-Mot. for J. on the Admin. R. and Resp. ("Def.'s Mot.") at 16, ECF No. 24. The Government explains that Coastal was unsuccessful in the MATOC competition due to weaknesses in its Factor 1 evaluation. *Id.* at 17–21. It argues that because Coastal's claims in this protest pertain entirely to its Factor 2 evaluation, correction of the alleged errors could not possibly remediate the Factor 1 weaknesses that led to denial of an award. *Id.* Thus, Coastal fails to allege facts indicating that it would have a substantial chance of award but for the alleged errors in the procurement process. *Id.* This Court agrees.

#### 1. Legal Standards

"[S]tanding is a threshold jurisdictional issue." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Bid protestors must meet the standing requirements of both Article III of the Constitution and the Tucker Act. Under the Tucker Act, a bid protestor must allege sufficient facts to demonstrate that it is "an interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has held that the term "interested party" means "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *E.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)); *see also Diaz v. United States*, 853 F.3d 1355, 1358 (Fed. Cir. 2017). Therefore, to establish standing, a plaintiff must allege facts demonstrating that it is an actual or prospective bidder and that it was prejudiced by the agency's decisions because it had a direct economic interest in the procurement. *Am. Fed'n of Gov't Emps.*, 258 F.3d at 1302.

The Government does not challenge Coastal's status as an actual offeror. *See* Def.'s Mot. However, it argues that Coastal failed to allege facts demonstrating prejudice. *Id.* at 16–20. In considering the Government's Motion to Dismiss, this Court accepts all well-pled facts in the Complaint as true and draws all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Erickson*

*v. Pardus*, 551 U.S. 89, 93–94 (2007) (collecting cases); *Pixton v. B & B Plastics, Inc.*, 291 F.3d 1324, 1326 (Fed. Cir. 2002). [3]

Bid protestors must address prejudice twice: during the standing inquiry and on the merits stage. *See, e.g.*, *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 n.4 (2006) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)); *Ekagra Partners, LLC v. United States*, -- Fed. Cl. --, 2022 WL 17827096, at *10 (Fed. Cl. Dec. 15, 2022). To satisfy the prejudice inquiry at the standing stage, a bid protestor must allege facts sufficient to show that "but for the alleged error, there was a substantial chance that it would receive an award—that it was within the zone of active consideration." *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 265 (2021) (citing *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011)). Protestors "must allege *facts*—not mere conclusory assertions of law—demonstrating prejudice." *Vanquish Worldwide, LLC v. United States*, -- Fed. Cl. --, 2022 WL 17087798, at *10 (Fed. Cl. Nov. 10, 2022); *Ekagra Partners*, 2022 WL 17827096, at *10. "[T]he court must decide whether those alleged facts show the protestor was prejudiced by the alleged errors." *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021).

The substantial chance standard is not one-size-fits-all. "[T]he question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 94 (2006). In the context of a multiple award contract, particularly where there is no cap on the number of awards, "the question here is not simply whether, but for the errors associated with their respective case, a protester had a substantial chance of receiving a contract award *instead of* one of the current awardees. Rather, the court must also ask whether, but for those errors, the same protestor had a substantial chance of receiving a contract award *in addition to* the other awardees." *Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008) (citations omitted).

### 2.  Plaintiff Misapplies the Standard.

Coastal argues that it was already within the "zone of active consideration"—and therefore had a substantial chance of award—simply by being "eligible and actively considered for award and, under some factors, more meritorious than the proposals of the awardees." Pl.'s Resp. at 4. At oral argument, Plaintiff's counsel expanded on this position. Counsel asserted that Coastal's inclusion in the best value tradeoff analysis automatically placed it in the zone of active consideration. As such, Coastal contends that it need not engage with the "but for" facet of the "substantial chance" standard to establish how correcting the alleged errors in the

---

[3] In this section, the Court relies on the facts alleged in the Complaint, the exhibits attached to the Complaint, and Plaintiff's opposition to the Government's Motion to Dismiss. However, because the Court's discussion of prejudice on the merits refers back to its analysis of prejudice in the standing inquiry, the Court includes in this section parallel citations to the administrative record and Plaintiff's Motion for Judgment on the Administrative Record, as appropriate.

procurement process would improve its evaluation. Coastal cites no authority for, and this Court disagrees with, its interpretation of the "substantial chance" doctrine.

The SSA performed a best value tradeoff analysis by "conduct[ing] a comparative analysis of the advantages and disadvantages associated with each individual Offeror . . . gathered from the proposals and the SSEB's evaluation of each proposal."[4] Pl.'s Ex. 10 at 27, ECF No. 1-11 (Revised Source Selection Document); AR 6294. The SSA stated that "[t]he outcome of the Comparative Analysis is a better understanding of which Offerors represent the best value to the Government." Pl.'s Ex. 10 at 27; AR 6294. He further explained that because "there are 17 proposals . . . and the Solicitation states that the intended target number of awards is ten, [he conducted] a series of detailed comparisons and cost/non-cost tradeoff decisions to ultimately determine the ranked order of all offerors." Pl.'s Ex. 10 at 28; AR 6295. The SSA made detailed comparisons and tradeoff decisions comparing each offeror to at least one other similarly ranked offeror based on the offerors' "apparent" rankings following the SSEB's evaluations. Pl.'s Ex. 10 at 28; AR 6295. The SSA then "determined a final ranked order of all proposals." Pl.'s Ex. 10 at 172; AR 6439.

After "complet[ing] all of the detailed comparisons and determin[ing] a ranked order for all proposals," the SSA stated that he could "see a clear break point between those proposals that appear to offer a better value compared to the proposals from other offerors." Pl.'s Ex. 10 at 175, 185–86; AR 6442, 6452–53. Finally, "[i]n order to complete [his] comparative analysis, [the SSA compared] the five lowest ranked proposals that appear to not be among the proposals that present the best value, to the group of 12 higher ranked proposals that appear to present the best value." Pl.'s Ex. 10 at 175; AR 6440. The SSA's final award decision used "the ranked order list that [he] determined from [his initial] comparative analysis." Pl.'s Ex. 10 at 191; AR 6458. The five offerors at the top of the list and the seven offerors in the middle of the list received awards, while the five offerors at the bottom of the list were not recommended for awards. Pl.'s Ex. 10 at 191; AR 6458.

Coastal was included in the best value tradeoff along with the other sixteen offerors. Pl.'s Ex. 10 at 28; AR 6295. Because Coastal's "apparent" ranking going into the tradeoff analysis was seventeenth, the tradeoff analysis included a detailed comparison of Coastal's proposal to the sixteenth-ranked non-awardee, [ * * * ]. Pl.'s Ex. 10 at 165; AR 6431. That tradeoff decision concluded that [ * * * ] presented a better value to the Government than Coastal, although the SSA did not recommend either firm for an award. Pl.'s Ex. 10 at 172; AR 6439. The initial comparative analysis also cemented Coastal's ranking as seventeenth. Pl.'s Ex. 10 at 173; AR 6440. After determining that the detailed comparisons showed a "clear break point" between winning and losing proposals, the SSA performed an additional comparison between Coastal's proposal and the group of twelve awardees as a whole. Pl.'s Ex. 10 at 175, 185–86; AR 6442, 6452–53.

---

[4] To the extent that Plaintiff's Exhibit 10 is redacted, the Court references the un-redacted version of the document as provided in the administrative record. *See* AR 6268–6460.

Thus, Coastal's inclusion in the tradeoff analysis was not due its proposal's competitiveness. Coastal's proposal was not seriously considered against any winning proposals, and its inclusion in the tradeoff analysis does not signal that Coastal had a substantial chance of award. Rather, the SSA compared Coastal to awardees only to demonstrate why its proposal did not represent the best value to the Government. Pl.'s Ex. 10 at 175; AR 6440. The SSA did not rely on these comparisons to make his primary award decision. Pl.'s Ex. 10 at 175; AR 6440.

Additionally, no competitive range was established to eliminate any of the second-rate offerors, including Coastal, from the tradeoff analysis. *See* Pl.'s Ex. 10 at 26; AR 6293. The results of the tradeoff analysis indicate both that the twelve awardees were in a superior class from the five lowest-ranked offerors and that Coastal was the least competitive of the lowest-ranked offerors. Coastal does not allege any facts to suggest that it would be possible to move up from or out of last place even with this Court's intervention. Therefore, there is no support for Coastal's contention that inclusion in the tradeoff analysis in this procurement equates to being in the "zone of active consideration."

Notably, even in cases where protestors are included in the best value tradeoff analysis, their claims are dismissed for lack of standing if they fail to demonstrate prejudice. *See Synergy Sols., Inc. v. United States*, 133 Fed. Cl. 716, 763 (2017) (protestor who was included in the competitive range and the tradeoff analysis failed to satisfy substantial chance standard, and thus lacked standing, partly because it did not allege facts sufficient to show that the agency's evaluation of the most important criterion was flawed); *Braseth Trucking, LLC v. United States*, 126 Fed. Cl. 608, 611, 615–16 (2016) (protestor who was included in the tradeoff failed to satisfy substantial chance standard, and thus lacked standing, where it did not sufficiently allege facts demonstrating that correction of the errors would improve its evaluation).

To be sure, "[t]he 'substantial chance' test . . . depends, in part, on the procurement context." *Info. Scis. Corp.*, 73 Fed. Cl. at 94. In the instant procurement, where all offerors were included in the best value tradeoff analysis, Coastal's suggestion that each offeror had a substantial chance of award swallows the rule. And here, there was a "clear break point" between winning and losing proposals. Pl.'s Ex. 10 at 26, 173; AR 6293, 6440. In this context, a substantial chance of award requires something more than being duly considered in a best value tradeoff analysis. Otherwise, last-ranked offerors such as Coastal could satisfy bid protest standing without addressing the fundamental purpose of the prejudice inquiry: why the Agency's putatively unlawful or arbitrary conduct matters.

### 3. Plaintiff Lacks Standing to Pursue this Bid Protest.

As further explained below, the Complaint and attached exhibits demonstrate that Factor 1 evaluations became the critical, distinguishing consideration in determining awards during the best value tradeoff analysis. However, Coastal's protest deals entirely with its Factor 2 evaluation and does not allege facts sufficient to show that the relief it seeks would resolve its

11

weaknesses under Factor 1. The Court finds that Coastal lacks standing because it has not alleged facts demonstrating that, but for purported errors in the procurement process, Coastal would have a substantial chance of award.

Coastal was the lowest-rated offeror overall. Pl.'s Ex. 10 at 172–73; AR 6439–40. It was also the offeror with the most Factor 1 weaknesses—it failed to submit projects demonstrating experience with "[ * * * ]" or with [ * * * ]. Pl.'s Ex. 10 at 186; AR 6453. Because of these weaknesses, the SSEB assigned Coastal an "Acceptable" rating for Factor 1. Pl.'s Ex. 10 at 175, 186; AR 6442, 6453. The SSA elaborated that "this combination of multiple weaknesses [was] a key discriminator between the Coastal proposal and each of the proposals included in the group of 12 more highly ranked proposals." Pl.'s Ex. 10 at 186; AR 6453. Importantly, Coastal does not allege that it has experience with [ * * * ] or [ * * * ]. Nor does it claim that errors in the procurement process caused its failure to submit projects in these two areas.

Despite the flaws with Coastal's proposal uncovered by the Factor 1 evaluation, Coastal's protest singularly focuses on errors that allegedly impacted its Factor 2 rating. It argues that, but for a latent ambiguity in the Solicitation, disparate treatment by the evaluation team, and the violation of the close at hand doctrine, Coastal would have had a substantial chance of award based on its Factor 2 and 3 proposals. *See* Compl. ¶¶ 2, 8, 27, 93; Pl.'s Resp. at 2–4; Pl.'s MJAR at 36–37. Specifically, Coastal alleges that if the errors were corrected and it was permitted to submit a new proposal, its Factor 2 rating would improve to "Substantial Confidence." *See* Compl. ¶¶ 92, 94, 100; Pl.'s MJAR at 36–37. This, combined with the fact that its "evaluated cost was [ * * * ]," places Coastal "well within the zone of active consideration." Compl. ¶ 100. However, a comparison of Coastal's proposal to those of awardees and the other non-awardees, using the facts alleged in its Complaint and attached exhibits, belies this argument. The factual allegations also make clear that Factor 1 was the deciding factor for this procurement.

The Complaint and the SSA's Source Selection Decision indicate that four other offerors were not awarded contracts: [ * * * ], [ * * * ], [ * * * ], and [ * * * ]. Pl.'s Ex. 10 at 28, 172–73; AR 6295, 6439–40. While all five non-awardees had varying Factor 2 ratings and Factor 3 costs, each non-awardee had at least one weakness under Factor 1, resulting in an "Acceptable" rating. *See* Pl.'s Ex. 10 at 28, 172–89; AR 6295, 6439–56. [ * * * ] was assigned one weakness for lack of company experience with cost-reimbursable Federal Government contracts, while [ * * * ], [ * * * ], and [ * * * ] were each assigned one weakness for lack of experience with construction of groundwater treatment plants requiring long term operation. Pl.'s Ex. 10 at 175–85; AR 6442–52. No awardee had a single weakness under Factor 1. Pl.'s Ex. 10 at 6, 8, 28, 172; AR 6273, 6275, 6295, 6439. In fact, none received lower than a "Good" rating. Pl.'s Ex. 10 at 6, 8, 28, 172; AR 6273, 6275, 6295, 6439. For each unsuccessful offeror, the SSA described the weakness(es) under Factor 1 as a "key discriminator" between its proposal and the twelve successful awardees' proposals. Pl.'s Ex. 10 at 175, 177, 180, 183, 186; AR 6440, 6444, 6447, 6450, 6453. For example, [ * * * ] and [ * * * ] each earned the rating that Coastal argues it should have earned for Factor 2— "Substantial Confidence." Pl.'s Ex. 10 at 28, 172; AR 6295, 6439. Even though they earned the highest possible rating for Factor 2—and in [ * * * ]'s case,

the lowest cost of all offerors—[ * * * ] and [ * * * ] were ranked thirteenth and fifteenth, respectively. *Id.*

Thus, Plaintiff's alleged facts suggest that a line between awardees and non-awardees in this procurement was drawn between those who provided company experience on all six items under Factor 1, and those who did not. It is evident that a "substantial chance of award" in this procurement requires, at a minimum, that an offeror demonstrate company experience in all six areas of Factor 1. *See Info. Scis. Corp.*, 73 Fed. Cl. at 94 ("The question of prejudice turns, in part, on the relationship between the protestor(s) and the specific procurement process that is being challenged.").

The facts alleged in the Complaint and accompanying exhibits indicate that Coastal was the only offeror lacking company experience in both [ * * * ] and [ * * * ]. Pl.'s Ex. 10 at 186; AR 6453. Thus, it was the only offeror with two weaknesses under Factor 1. Pl.'s Ex. 10 at 186; AR 6453. It also had the [ * * * ] cost of all non-awardees and the [ * * * ] cost overall. Pl.'s Ex. 10 at 28, 172; AR 6295, 6439. The Complaint does not allege facts suggesting that errors in the procurement process caused the Factor 1 weaknesses or that a new proposal could remediate these weaknesses. Neither does Coastal allege that any of its higher ranked competitors should have been ranked lower. *See Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 366 (2009) (stating in the merits prejudice context that "[i]n a multiple-award contract, prejudice analysis must take into account the impact of the error on all the awards, including whether the correction of an error 'might not only improve the protester's evaluation, but diminish that of a current awardee, or even eliminate that awardee from further consideration altogether'") (quoting *Serco Inc.*, 81 Fed. Cl. at 501); *Joint Venture of Comint Sys. Corp v. United States*, 102 Fed. Cl. 235, 252 (2011) (applying *Afghan* in the standing prejudice context); *Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 90 n.10 (2011) (same). Therefore, the facts alleged in the Complaint, when taken as true, do not sufficiently demonstrate that Coastal could improve its overall ranking, regardless of how its Factor 2 evaluation might change with this Court's intervention.

Finally, Coastal argues that the proposed relief "may" resolve the issues in its Factor 1 evaluation because the projects submitted under Factor 1 relate to the past performance evaluated under Factor 2. Pl.'s Resp. at 6. However, Coastal fails to allege any facts explaining how a new proposal would resolve the two weaknesses assigned to its Factor 1. Coastal believes that it is *possible* its Factor 1 rating could improve if the alleged errors in the procurement process were corrected and Costal submitted a new proposal. *See* Pl.'s Resp. at 6 ("[I]t is impossible to determine at this stage exactly how Coastal's Factor 1 proposal might change based on a clarification of the latent ambiguity."). But bid protestors must allege more than a "bare possibility" of a substantial chance of award to establish prejudice. *See Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016).

Again, Coastal does not allege that it has the experience required to remediate the weaknesses under Factor 1. Indeed, the facts as alleged in the Complaint and attached exhibits suggest the opposite. *See* Pl.'s Ex. 10 at 24 (SSA explaining that unsuccessful offerors "cannot

13

simply 'manufacture' more or new company experience that is more relevant than the portfolio of work already included in their proposal"); AR 6291.  Therefore, Coastal's arguments on this point do not rise above a "bare possibility" that a new proposal would improve its Factor 1 rating, let alone lead to a substantial chance of award.  *See Synergy Sols.*, 133 Fed. Cl. at 763 (finding that the protestor lacked standing because it "[did] not claim that the [agency's] evaluation of the most important criterion—Criterion 1 (Technical Approach)—was flawed. [The awardee's] proposal was rated 'Excellent' in that category while [protestor's] proposal was only rated 'Good'").  Accordingly, the Court dismisses this bid protest for lack of standing.

### B.      Cross-Motions for Judgment on the Administrative Record

This Court finds in the alternative that Coastal's claims concerning a latent ambiguity in the Solicitation, disparate treatment, and violation of the close at hand doctrine lack merit. Additionally, for the same reasons that Coastal has not sufficiently alleged that it was prejudiced by the Agency's conduct, it also fails to demonstrate prejudice on the merits.

#### 1.      Legal Standards

In reviewing cross-motions for judgment on the administrative record pursuant to RCFC 52.1, this Court asks "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc.*, 72 Fed. Cl. at 131 (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).  A bid protestor "bears the burden of proving error in the procurement process sufficient to justify relief." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).

An agency's procurement action may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *E.g.*, *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (citation omitted).  This standard in the bid protest context "is highly deferential and requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *BayFirst Sols., LLC v. United States*, 104 Fed. Cl. 493, 500 (2012) (quotation marks omitted) (quoting *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)).  The bid protestor must prove, by a preponderance of the evidence, that either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *E.g.*, *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (collecting cases).

When this Court evaluates challenges brought on the first ground, it "determine[s] whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).  "[C]ontracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  In this analysis, "the court 'may not substitute its judgment for that of the agency' if the

agency's decision is reasonable." *Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452, 464 (2008) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989). A decision is not reasonable if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Omega*, 82 Fed. Cl. at 464–65 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). To succeed on a challenge brought on the second ground, a bid protester must show "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333.

In addition to demonstrating an error in the procurement process under the foregoing standards, a bid protestor also bears the burden of proving that it was prejudiced by that error. *Bannum*, 404 F.3d at 1353, 1358. As discussed above, the standard for establishing prejudice is the same at the merits stage as in the standing inquiry, except that the protestor must prove, by a preponderance of the evidence, both that the error occurred and that it actually prejudiced the protestor. Here, Coastal does not meet these burdens. It fails to allege facts in its Complaint demonstrating prejudice, and even if it could prove that the Agency committed reversible error, it cannot show that it was prejudiced by such error. *See Sys. Studs. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) ("[T]here is no presumption of prejudice [even] when a protestor demonstrates irrationality in an agency decision.").

### 2. Latent Ambiguity Claim

Coastal asserts that the RFP contained a latent ambiguity regarding the retrieval and evaluation of past performance information from CPARS, which resulted in an arbitrary and capricious evaluation of Coastal's proposal. Compl. ¶¶ 9–24; Pl.'s MJAR at 1. It takes issue with the following italicized language of Section M of the RFP:

> *The past performance evaluation will consider each offeror's demonstrated recent and relevant record of performance on the seven (7) examples of similar projects submitted as part of Factor 1 – Company Experience, and any additional past performance information obtained by the Government from other sources.* The Government will evaluate the Past Performance Questionnaires (PPQs) submitted with the proposal for the Factor 1 projects, along with any PPQs received directly from the offeror's clients for the Factor 1 projects. . . .
>
> *In addition to the PPQs, the Government will review past performance information retrieved through CPARS*, using all DUNS numbers of team members (partnership, joint venture, teaming arrangement, or parent company/subsidiary/affiliate) identified in the offeror's proposal whose experience is being relied on for Factor 1. *The Government will consider only the first 20 most recent and relevant CPARS evaluations*.

AR 274 (emphasis added). Coastal interpreted this language as requiring the agency to take the following actions as a part of its Factor 2 evaluation: "(1) review any PPQs

15

submitted for the Factor 1 projects, so long as they fall within the defined ten-year period; (2) *retrieve* past performance information from CPARS for all work performed by Coastal within the defined ten-year period, including the CPARS for the Factor 1 projects performed within the ten-year period; (3) *sort* the CPARS retrieved for relevancy, followed by recency, and *evaluate* up to twenty of the most recent and relevant CPARS to be counted toward Coastal's Factor 2 rating; and (4) review 'any additional past performance information obtained by the Government from other sources.'" Pl.'s MJAR. at 16 (citations omitted) (emphasis in original).

Courts review the interpretation of a solicitation's terms de novo. *CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 131 (2022). When interpreting a solicitation, courts "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Safeguard Base Operations, LLC v. United States*, 144 Fed. Cl. 304, 334 (2019) (emphasis omitted). "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." *Banknote Corp.*, 365 F.3d at 1353. A latent ambiguity is one that is "neither glaring nor substantial nor patently obvious." *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (quoting *Mountain Home Contractors v. United States*, 425 F.2d 1260, 1264 (Ct. Cl. 1970)). If an ambiguity is latent, such that "the ambiguity 'was not obvious on the face of the solicitation and reliance is shown,' the ambiguity will be construed against the Government as the drafter." *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 238 (2021) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004)). An ambiguity in a solicitation arises where the solicitation is susceptible to more than one reasonable interpretation. *Blue Tech, Inc.*, 155 Fed. Cl. at 237.

Here, the Solicitation is unambiguous, and Coastal's interpretation is unreasonable. Coastal reads a ten-year window into the CPARS retrieval period, but the Solicitation is silent on this issue. It states only that "[a]ll CPARS are considered recent" under Factor 2. AR 274. Importantly, "silence does not necessarily translate to ambiguity." *Wildflower Int'l, Ltd. v. United States*, 105 Fed. Cl. 362, 388 (2012) (applying this principle in the solicitation interpretation context) (first citing *Wanless v. Shinseki*, 618 F.3d 1333, 1337 (Fed. Cir. 2010) (applying this principle in the statutory interpretation context); and then citing *Thomas v. Nicholson*, 423 F.3d 1279, 1284 n.5 (Fed. Cir. 2005) (same)).

Moreover, the Solicitation only names a ten-year window in reference to (1) the acceptable time window for past projects that offerors could submit for Factor 1, AR 264, and (2) the recency period for PPQ submissions, AR 274. Coastal argues that these references to a ten-year window indicate that the required retrieval period for CPARS is ten years. *See* Pl.'s MJAR at 15–16. First, Plaintiff avers that the Solicitation language establishing the window for Factor 1 projects creates a requirement that the Agency retrieve all of an offeror's CPARS data over ten years for its Factor 2 evaluation. *Id.* But this departs from the Solicitation's plain and ordinary meaning. *See Banknote Corp.*, 365 F.3d at 1353. That offerors were permitted to submit projects up to ten years old under Factor 1 does not mean that the Agency was required to retrieve ten years of CPARS information in its Factor 2 evaluation.

16

Second, Plaintiff argues that the Solicitation's description of the recency period for PPQ submissions creates a ten-year window for CPARS retrieval. *See* Pl.'s MJAR at 16. This interpretation is similarly incongruous with the Solicitation's plain language. The sentence immediately following the Solicitation's statement that "[a]ll CPARS are considered recent" states: "All PPQs covering work that was performed within the past 10 years are considered recent." AR 274. If the Solicitation intended the relevant window for CPARS to be ten years, it might have stated "All *CPARS and* PPQs covering work that was performed within the past 10 years are considered recent." However, this was not the case. The Court must give meaning to the drafters' decisions to include the CPARS recency period in a separate sentence from the PPQ recency period and to remain silent on the precise window for CPARS recency. *See Safeguard Base Operations*, 144 Fed. Cl. at 334.

Indeed, the CPARS retrieval window is set by regulation. Coastal alleges that the six-year limitation on CPARS was undisclosed to the offerors, resulting in prejudice in its Factor 2 evaluation. Pl.'s MJAR at 18, 24. However, the Federal Acquisition Regulation ("FAR") provides that "[a]gencies shall use the past performance information in CPARS[] that is within three years (six for construction and architect-engineer contracts) of the completion of performance of the evaluated contract or order." FAR 42.1503(g); 48 C.F.R. § 42.1503(g).

This six-year limitation is also noted in the training module for contractors on the CPARS website. *See Training by Function*, *Contractor Overview*, CPARS, https://cpars.gov/lc_function.htm (last visited Jan. 7, 2023) ("Here are some important points to remember. . . . Report cards are retained for three years after contract completion, with the exception of Architect-Engineer and Construction contracts, which remain in the system for six."). The law presumes that offerors are on notice of the statutes and regulations governing the procurement process. *See, e.g.*, *Meidl v. United States*, 100 Fed. Cl. 1, 7 (2011) ("[I]t is a 'well-established rule that a citizen is presumed to know the law, and that ignorance of the law will not excuse.'") (quoting *Page v. United States*, 51 Fed. Cl. 328, 339, n.13 (2001)); *Georgia v. Public.Resource.Org, Inc*, 140 S.Ct. 1498, 1507 (2020).

Coastal believes the Solicitation should have explicitly noted that the Agency could only retrieve CPARS data from the past six years. However, even if this would have made the Solicitation clearer, it still would be an insufficient basis upon which to render the procurement unlawful. "It is outside the Court's bid protest authority to invalidate a solicitation term simply because the Court might have drafted the language differently or used a different approach," and thus, "the Court will not find a provision of a solicitation ambiguous just because it could have been more clearly drafted." *CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 666, 675 (2011); *see Honeywell*, 870 F.2d at 648.

Coastal points to the Agency's Q&A responses to support its interpretation of the RFP. Pl.'s MJAR at 16 (citing AR 386); *see also* AR 392, 397. In its Q&A responses, the Agency instructed offerors not to submit CPARS in their proposals because this could result in duplicates when the Agency retrieved the CPARS. AR 386, 392, 397. Coastal believes that this instruction "categorically prohibited the provision of CPARS by offerors in their proposals, without making exception for CPARS for work performed only within . . . more than six but less than ten years." Pl.'s MJAR at 17. It concludes that the Agency's concerns about duplicate CPARS reports

17

"extended to all projects performed within the entire ten-year period, and not just a subset performed more recently," indicating that the Agency would retrieve CPARS data for all work performed within ten years. *Id.* But this argument does not support Coastal's latent ambiguity claim. Rather, it is merely a disagreement with the Agency's discretionary decision not to make an exception allowing offerors to submit CPARS data that is older than six years.

Moreover, Coastal confirmed through the Agency's Q&A responses that it would not be permitted to submit its own CPARS. *See* AR 386, 392, 397. Thus, Coastal knew—or should have known—that the Agency did not intend to consider or retrieve projects older than six years from CPARS due to the database's retention policy. *See* AR 386, 392, 397. But when it submitted its proposal, Coastal claims it believed the RFP to mean that the Agency was required to "retrieve past performance information from CPARS for all work performed by Coastal within the defined ten-year period, including the CPARS for the Factor 1 projects performed within the ten-year period." Pl.'s MJAR at 16 (emphasis omitted). If this was, in fact, its understanding of the Solicitation, Coastal was obliged to challenge or seek clarification of the Agency's Q&A responses. *Cf. Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

### 3. Disparate Treatment Claim

Coastal asserts that it was subjected to disparate treatment in the Factor 2 evaluation process for two reasons. First, the Agency exchanged one of the members of the two-person Factor 2 evaluation team, which allegedly held Coastal to a different standard than other offerors. *See* Pl.'s MJAR at 30. Coastal purports that the "new" evaluation team penalized it and held it to a stricter standard than two awardees, [ * * * ] and [ * * * ], for its failure to submit PPQs for all seven Factor 1 projects. *Id.* Next, Coastal argues that it only submitted four out of seven PPQs in reliance on a latent ambiguity in the Solicitation. *Id.* The Court has already rejected Coastal's latent ambiguity claim.

"An agency decision is arbitrary and capricious when it results from unequal treatment of the offerors." *Thalle Constr. Co. v. United States*, 159 Fed. Cl. 698, 707 (2022). An offeror suffers from unequal—or disparate—treatment where "the agency unreasonably downgraded its proposal for deficiencies that were substantively indistinguishable or nearly identical from those contained in other proposals," or where "the agency inconsistently applied objective solicitation requirements between it and other offerors." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (internal quotations and citations omitted) (collecting cases).

Coastal falls short of proving disparate treatment. There is no basis to find that the different evaluation team penalized Coastal's proposal for failing to provide PPQs for all seven Factor 1 projects. And Coastal's assertion that a mere change in the evaluation team resulted in disparate treatment is unsupported by fact or law. The record indicates that Coastal's proposal was substantively distinguishable from [ * * * ] and [ * * * ]'s proposals. Coastal submitted only four of seven PPQs, while [ * * * ] and [ * * * ] each submitted six of seven PPQs. AR 3972–73

([ * * * ] evaluation sheet), 3979–89 ([ * * * ] evaluation sheet), 6145 (Coastal evaluation sheet). [ * * * ] and [ * * * ] were assigned "Substantial Confidence" past performance ratings, while Coastal earned "Satisfactory Confidence." AR 3972–73, 3979–89; 6145. The lack of CPARS for Coastal, compared to the other offerors, further contributed to Coastal's lower rating. *Id.* Given that Coastal's complaint centers on the Agency's assessment of the amount of past performance data in the Factor 2 evaluation, Coastal's lack of PPQs and CPARS relative to its peers is a substantive difference. Given this clear distinction, Coastal also cannot establish that the Agency inconsistently applied the Solicitation's requirements concerning past performance data.

Furthermore, the Agency did not in fact "penalize" Coastal, or any offeror, for lacking PPQs. *See* Pl.'s MJAR at 29. The Solicitation provides that "[a]bsent any recent and relevant past performance history, the offeror's proposal will not be evaluated either favorably or unfavorably on performance confidence." AR 6733. Additionally, the evaluation documents do not indicate that the SSEB downgraded Coastal's Factor 2 rating for the lack of past performance data. Rather, the SSEB explained that the lack of information merely "did not raise the team's overall confidence of successful future performance." AR 6145.

### 4. Close at Hand Doctrine Claim

The "close at hand" past performance doctrine "reflects the duty of an agency to consider relevant information in its possession notwithstanding whether it was actually submitted by an offeror or whether the agency has sought similar information for other offerors." *Shaw-Parsons Infrastructure Recovery Consultants, LLC*, 2010 CPD ¶ 77 at 7. Coastal alleges that the Agency violated the close at hand doctrine because Agency correspondence revealed "that the SSEB sought additional past performance information pertaining to a contract which it knew Coastal had performed and which it believed should have been captured in the Agency's retrieval of CPARS during its Factor 2 evaluation." Pl.'s MJAR at 26 (citing AR 6035). The Agency did not complete a CPARS for this project, but the SSEB obtained a copy of the final Contracting Officer Representative ("COR") Report that contained past performance information. AR 6035. That project was also with the Corps, and the COR Report was prepared and signed by the same individual who served as the SSA for the instant procurement. AR 6032–35.

Here, the Agency correspondence at issue appears to document the SSEB's attempt to thoroughly evaluate Coastal's proposal.[5] AR 6035. The Solicitation permitted, though did not require, the Agency to collect past performance information other than CPARS and PPQs. AR 274. It did so by collecting the COR Report. AR 6035. The Agency exercised its discretion to omit the two-page COR Report in its evaluation, and the Government provided a "coherent and reasonable explanation of its exercise of discretion"—the COR Report was not relevant. *See Axiom*, 564 F.3d at 1381; Def.'s Mots. at 38 (citing AR 274). Specifically, the Government

---

[5] The correspondence consists of an exchange between two Agency personnel on February 23, 2022. The first email reads: "This is the task order that I am remembering that should pull in CPARS at a minimum. . . . It should fall into the range that pulls. Final COR report attached from Michelle." The response: "I talked to Michelle and she did not do any CPARS for this project." AR 6035.

19

explains that the COR Report was irrelevant because it did not identify either the contract's scope or valuation, "two key considerations in the determination of relevancy." Def.'s Mots. at 38 (citing AR 274).  Agencies are afforded broad discretion to make decisions during the procurement process.  *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l*, 19 F.3d at 1356).  A court may not substitute its judgment for that of the Agency when the Government has provided a reasonable explanation for the decision, as the Government has done here.  *Omega*, 82 Fed. Cl. at 464 (quoting *R & W Flammann GmbH*, 339 F.3d at 1322); *see also Honeywell*, 870 F.2d at 648.  Therefore, Coastal has not shown that the Agency violated the close at hand doctrine.

### III.    Conclusion

For the reasons set forth above, the Government's Motion to Dismiss is **GRANTED**.  In the alternative, the Government's Motion for Judgment on the Administrative Record is **GRANTED**, and Plaintiff's Motion for Judgment on the Administrative Record is **DENIED**.  The case is **DISMISSED**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge